FIRST NATIONAL BANK OF CENTREVILLE v. B. E. WILKINS et al. and CITIZENS NATIONAL BANK OF DICKSON v. B. E. WILKINS et al., Consolidated Causes.

Middle Section. November 9, 1929.

Petition for Certiorari denied by Supreme Court, March 1, 1930.

Clagett & Pinkerton, of Centreville, and W. A. Knight, of Nashville, for appellant, First National Bank of Centreville.

Howard E. Brown, of Dickson, for appellant, Citizens National Bank of Dickson.

J. H. Dinning, of Columbia, and Connor Bates, of Centreville, for appellee, Mrs. Maude Higman.

CROWNOVER, J. These two causes were consolidated and tried together for the reason that the bill in each cause sought to set aside as fraudulent the same conveyance and to have appellants' debts satisfied out of the same property.

The Chancellor held that the grantee was a purchaser for a fair consideration without knowledge of the fraud at the time of the purchase and declined to set aside the conveyance. He dismissed the bills as to Mrs Maude Higman and the complainants have appealed to this court.

The First National Bank of Centreville, on June 4, 1925, brought its suit in the chancery court of Hickman county to recover for certain indebtedness amounting to $2885, together with interest and attorney's fees, due it from the defendants, B. E. Wilkins, Sr., B. E. Wilkins, Jr., C. B. Wilkins, A. Brown Wilkins and Richard Wil-

kins; to have set aside, as fraudulent, a certain conveyance of four hundred acres of real estate and personal property, made on January 28, 1925, by defendant, B. E. Wilkins, Sr., to his daughter, Mrs. Maude Higman, and her husband, Thomas Higman; and to have said property sold to satisfy said indebtedness.

The defendants demurred to the bill for multifariousness and for other reasons, but later waived the demurrer and agreed to answer, and thereupon the court overruled the demurrer.

The defendants Wilkins answered and admitted the indebtedness. Defendants B. E. Wilkins, Sr., and wife, Susie E. Wilkins, answered and admitted the sale of the property to their daughter, Mrs. Maude Higman, and her husband, Thomas Higman, but denied that said sale was made to hinder, delay and defraud their creditors in the collection of their debts, and insisted that said conveyance was made in good faith and for a valuable and fair consideration; and they denied that defendants, Maude Higman and her husband, had any knowledge of B. E. Wilkins' indebtedness. They further denied that B. E. Wilkins, Sr., remained in the possession, management and control of said property after said sale.

Defendants, Maude Higman, and her husband, Thomas Higman, answered and denied knowledge of said indebtedness, denied that said conveyance was made to defraud creditors, and alleged that they had paid a fair and sufficient price for the property.

Defendant Thomas Higman died, and at the July, 1926, term of the court his death was duly suggested and the cause was revived against Mrs. Maude Higman as administratrix.

On March 2, 1926, the Citizens National Bank of Dickson filed its bill in the chancery court of Hickman county against B. E. Wilkins, Sr., R. P. Work, C. B. Wilkins, the National Life & Accident Insurance Co., and Mrs. Maude Higman, seeking to recover a decree against B. E. Wilkins, Sr., for certain indebtedness amounting to $6931.39; and to have set aside as fraudulent said conveyance to defendant Maude Higman, and to have said lands sold, subject to the $7000 mortgage of the National Life & Accident Insurance Co., and to have the proceeds applied on said decree.

Said bill was answered by Mrs. Higman, in which she made practically the same defenses, admissions and denials that she made in her answer to the first bill.

The National Life & Accident Insurance Co., answered, setting up its mortgage, and judgments pro confesso were taken as to the other defendants.

On motion, the causes were consolidated, as they sought to set aside the same conveyance and to have the same property sold in satisfaction of their debts.

The consolidated causes were heard by the Chancellor upon depositions and the record, and he rendered decrees in favor of the respective complainants upon all of the indebtedness sued on, and decreed that the deed to Mrs. Higman was fraudulently made by the vendors, B. E. Wilkins, and wife, as alleged in the bills, and for the purpose of hindering, delaying and defrauding said creditors, but the Chancellor further found and decreed that this fraud was unknown to and not participated in by the defendants, Maude Higman and Thomas Higman, and that they knew nothing of the indebtedness of the grantor, had purchased the property in good faith, and had paid a fair consideration for the same, therefore the Chancellor declined to set aside said conveyance as to Mrs. Maude Higman, and dismissed the bills as to her.

Both complainants have appealed to this court and have assigned errors, which are in substance:

(1) That the court erred in finding that Mrs. Maude Higman was not a party to the fraudulent schemes and devices of B. E. Wilkins, Sr., and in dismissing the bill as to her.

(2) The court erred in finding and decreeing that $15,000 was a fair and reasonable value for the property conveyed.

(3) That the court erred in holding and decreeing that the statements of B. E. Wilkins made to W. L. Pinkerton and W. R. Boyte, admitting the fraudulent conveyance, had no probative value as against defendant Maude Higman.

(4) That the court erred in dismissing the bill against the defendant National Life & Accident Insurance Co.

B. E. Wilkins, Sr., owned and operated a farm of about four hundred acres near the village of Only in Hickman county, Tennessee. He was about seventy years of age.

Several of Wilkins' sons and his son-in-law had borrowed a considerable amount of money from the two complainant banks with B. E. Wilkins, Sr., as surety, during the years 1924, 1925 and 1926.

A daughter of B. E. Wilkins, Sr., had married Thomas Higman in April, 1922, and moved to Douglas, Arizona, but resided a part of the time in Old Mexico, where her husband was an underground superintendent of copper mines for the Phelps-Dodge Corporation of New York City, on a salary of $416 per month with an additional bonus. This daughter is defendant Mrs. Maude Higman. Thomas Higman's health had been impaired by years of work under ground, and he and his wife planned to buy a farm and retire to it. He was an Englishman, but had visited Tennessee with his wife on two occasions since their marriage.

In the early part of the year 1924, Mrs. Higman visited her parents. She looked at farms in several counties with the intention of purchasing. Finally it was suggested by her brother that she pur-

chase her father's said farm. Upon consulting her father, B. E. Wilkins, Sr., he agreed to sell her said farm for $20,000. She agreed to buy the farm, subject to her husband's approval, and paid $1000 cash on the purchase price and gave her brother, B. E. Wilkins, Jr., $300 with which to purchase two mules for the place. She immediately returned to Mexico and reported the tentative purchase to her husband, but he was unwilling to pay $20,000 for the place, and she advised her father of this by letter.

In January, 1925, she again visited her parents, and the subject of purchasing the farm was again mentioned, and she told her father that her husband would not agree to pay more than $15,000. An agreement was finally reached between her and her father, by which he agreed to sell the farm together with certain stock and implements on the same for $15,000, as he had previously offered to sell it to other people in that community for $15,000.

Thereupon, Mrs. Higman wrote her husband of the purchase, explaining that there was a mortgage of $7000 going to the National Life & Accident Insurance Co., and that she had previously paid $1000 in cash on the purchase price, and that the balance due B. E. Wilkins, Sr., was $7000, that the deal was for cash and the assumption of the mortgage, and that it would be necessary to have some additional cash to operate the farm. In response to this letter her husband sent her two checks, one for $4300 and the other for $3700, on the bank of Douglas, Arizona.

Upon the receipt of the two checks from her husband, the deed was prepared, acknowledged and delivered, conveying said property to her and her husband as tenants by the entireties, and was filed in the register's office of Hickman county for registration. Immediately thereafter Mrs. Higman, her father and her brother, B. E. Wilkins, Jr., went to Nashville, where Mrs. Higman had a Mr. Wherry to endorse the checks that she might obtain the cash at once and pay her father. She explained that had the checks been sent for collection to Douglas, Arizona, it would have taken about fifteen days for the money to have been obtained, which would have delayed her return to Mexico. However, she was unable to get the cash at once, but the Fourth & First National Bank of Nashville, after receiving said checks, wired the bank of Douglas, Arizona, and the money was made available within three or four days thereafter. Her explanation of why she had Mr. Wherry to endorse the checks and deposit them in his bank account is that she thought the money could be had immediately on his endorsement. There is nothing in the record to contradict this. When Wherry was notified that the $8000 was deposited to his account, he, as appears from his bank account, made two checks, one for $7800 and the other for $200. Mrs. Higman deposited the $7800 to her account in the Fourth & First

National Bank in Nashville on February 11, 1925. Two days later, she drew all of this $7800 out of said bank, in currency. She took $7000 in currency and paid it to her father at Only, because her father wished it to be done that way, but gave her no reasons therefor.

Immediately after the consummation of the sale, Ben Wilkins, Jr., was engaged to manage the farm for Mrs. Higman and her husband. A bank account was opened in the First National Bank of Centreville by Thomas Higman, on February 25, 1925, and deposits were made at intervals by him. The bank was also instructed to honor the checks of Ben Wilkins, Jr., on this account.

Mrs. Higman states that a part of the consideration for the conveyance of the farm was that the grantors should make their home on said farm in their declining years, and they continued to reside on said farm, but B. E. Wilkins, Sr., exercised no control or management of the same.

In the summer of 1925, Mr. and Mrs. Higman came to the farm, and while there, process and copy of the bill of the First National Bank of Centreville was served on them, and they insisted that this was the first knowledge that they had of the debts of B. E. Wilkins, Sr., for which these suits were brought. They filed their answer on September 3, 1925, denying knowledge of the indebtedness and insisting that the purchase of the farm was in good faith and for a fair consideration.

In December, 1925, Thomas Higman sent in his resignation to his company and he and his wife came to reside on the farm, but on February 25, 1926, he contracted pneumonia and died intestate, leaving surviving him as his only heir-at-law his widow, Mrs. Maude Higman, who has defended this suit, and now insists that she is the absolute owner of this property as survivor under the deed conveying it to them as tenants by the entireties.

Assignments number one and number two, as above enumerated, (1) that the grantee participated in the fraud, and (2) that the consideration was inadequate, must be overruled, as a conveyance attacked for fraud must be upheld where the proof shows that there was no fraud on the part of the grantee and that the consideration was fair and adequate.

The Uniform Fraudulent Conveyance Act of 1919, chapter 125, section 9, provides:

"Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, have the conveyance set aside," etc.

"There is authority to the effect that a voluntary conveyance made by a debtor, with actual intent to defraud either existing or subsequent creditors, is void as to the creditors to whom the fraudulent intent exists. Churchill v. Wells, 7 Coldw., 364. But the weight of authority seems to be that in a fraudulent conveyance to defeat creditors, the conveyee or party secured by the fraudulent conveyance must have knowledge of the purpose and participate in the fraudulent design." Gregory v. Guinn, 4 Tenn. App., 10, 18; Keith v. Proctor, 8 Bax., 190-1; Vance v. Smith, 2 Heisk., 343, 353; Churchill v. Wells, 7 Cold., 375; Mills v. Haines, 3 Head, 331, 334; Peck v. Carmichael, 9 Yerg., 324, 327.

"In order to make a sale void as to creditors, it is not only necessary that the vendor should design a fraud, but that the vendees should participate therein." Peck v. Carmichael, 9 Yerg., 324, 327.

"If a transfer is for a valuable consideration, creditors cannot attack it because of the fraudulent intent of the grantor, where the grantee had neither (1) actual notice of such intent, nor (2) notice of any fact or facts calculated to put him on inquiry and which would lead to a discovery of such intent, nor (3) participated in fraud." 27 C. J., 506, sec. 175.

"The definition of fraud is a question of law. But the existence of fraud, whether actual or constructive, is, at least in the absence of a statute to the contrary, a question of fact to be established by the evidence in each particular case, and courts are not permitted to indulge in presumptions of fraud and therefrom conclusively judge as a matter of law that a particular conveyance is fraudulent. So, also, whether or not the alleged fraudulent vendee participated in the fraudulent intent of the grantor is a question of fact." 6 Ency. of Ev., 159-160.

■ The Chancellor found that Mrs. Higman was not a party to the schemes of B. E. Wilkins to defeat his creditors; that she was residing in Mexico and had not resided in Hickman county for several years and her husband had never resided in Tennessee, and they knew nothing of the indebtedness of the grantor or his purpose to defraud his creditors.

After an examination of the record we are unable to find any testimony or statements to suggest that Mrs. Higman knew that her father was involved in debts or that he was disposing of his property to avoid payment of these debts. It appears from the record that B. E. Wilkins, Sr., had been well to do and operated a large farm. The banks accepted him as surety on notes amounting to almost $10,000—a substantial sum. Mrs. Higman had been away

from home for several years, and appears to have had no knowledge that he had become involved; these notes appear to have all been executed after her marriage and removal to Mexico. Her father was seventy years of age, had recently suffered an accident which was serious to one of his age.

It appears reasonable that she believed that her father wanted to sell the farm because he was not physically able to manage it, and had not sufficient ready money to operate it.

It is insisted that, as the parties were related and the transactions were questionable, the conveyance was fraudulent. It is true that the relationship of the parties is an element to be looked to, and has been looked to by us in arriving at our conclusion, but such relationship has never been held to be conclusive of fraud. Johnson v. Goldston (Tenn. Chy. App.), 52 S. W., 474.

"The general rule is that the relationship of the parties in the transaction as parent and child is not considered in law as a badge of fraud, but is simply a circumstance proper to be shown, and which when shown calls for close scrutiny and clear explanation of the transaction." 27 C. J., 646, sec. 413; Rosenbaum v. Davis (Tenn. Chy. App.), 48 S. W., 706; Bank of Maryville v. Thornton (Tenn. Chy.), 35 S. W., 565.

"Relationship of the parties to a conveyance is not, of itself, a badge of fraud; but a fact, which naturally awakens suspicion, and lends greater weight to other unfavorable circumstances, and renders necessary fuller and more distinct proof of the consideration and fairness of the transaction." Robinson v. Frankel, 85 Tenn., 475, 3 S. W., 652; Bank of Maryville v. Thornton (Tenn. Chy.), 35 S. W., 565.

The other badges of fraud discussed by complainants need only be briefly discussed. There seems to have been no haste in the transaction. The first negotiations were in March, 1924, and the final sale was not made until January 28, 1925, almost a year later. The deed was written in Columbia, acknowledged and recorded in Hickman county, and the checks were cashed in Nashville. This of itself might cast some suspicion upon the transaction, had it not been explained by Mrs. Higman. She said that she left the matter of the execution of the deed to her father and that he wanted the cash payment to be in currency; that she had the checks cashed and paid him the currency without knowing or suspecting that he was trying to defeat his creditors; and she positively denies that she had any knowledge that he owed any debts. There is no evidence to the contrary. There seems to have been no secret that Wilkins wanted to sell the farm, as he had offered it for sale to several other people in that county.

The presence of the aged and sick parents at the home on this place is not a suspicious circumstance, as it is proven that they had no control or management of the farm.

Hence, we are of the opinion that there is no evidence that Mrs. Higman knew of the indebtedness or aided her father to defraud his creditors.

■ The consideration paid for the farm and equipment, under the proof, was a fair consideration. She had already paid her father $1000, assumed a mortgage of $7000, and paid him $7000 in cash. The weight of proof is that this was a fair price. There was proof that there was little buying of farms at that time and that farm land in that section had declined in value during the past few years, and that this farm had depreciated in value because the improvements were not in a good state of repair.

Complainants argue that there was no consideration paid. The record shows that Mr. Higman sent checks for the purchase price, that these checks were cashed, and that Mrs. Higman left the Fourth & First National Bank with $7000 in currency, which she swears that she delivered to her father. She says that she treated the deed reciting the consideration to be $7000 cash as a sufficient receipt. This is all the evidence in the record on the subject, and it must be held that the consideration was paid.

There is a difference between a fraud in fact and a fraud in law. Under the Fraudulent Conveyance Act of 1919, chapter 125, where one buys land in good faith, but does not pay a fair consideration, the conveyance may be treated as a fraud in law and the conveyence may be set aside, the property sold, and out of the proceeds the vendee may be repaid what he had paid in good faith on said land, and the balance of the proceeds may be applied on the debts of the creditors. Bank of Blount County v. A. D. Dunn et al., 10 Tenn. App., 95; Alley v. Connell, 3 Head, 577. But this law can have no application to the present case, as the record shows that Mrs. Higman paid in good faith and without notice a fair consideration for the property. And, therefore, this assignment must be overruled.

3. The third assignment that the Chancellor erred in holding that the statements made by B. E. Wilkins to the witnesses, W. L. Pinkerton and W. R. Boyte, after he had executed the deed, to the effect that he had made a conveyance to his daughter, Mrs. Higman, in order to defeat his creditors, that he had talked the matter over with her and they had conferred with an attorney who had arranged matters so that it could not be set aside, had no probative value as against defendant Mrs. Maude Higman, is not well taken and must be overruled.

"Upon proof of a conspiracy between a vendor and a vendee for the purpose of defrauding the former's creditors, evidence of his declarations and admissions is proper, although they were made after the conveyance and in the absence of his co-conspirators." 3 Ency. of Ev., 433.

All are liable if the conspiracy is established. Brumley v. Speedway, etc., Co., 138 Tenn., 534, 198 S. W., 775.

"But before evidence of the acts and declarations of persons not parties to the action can be properly received in evidence, in cases of this character, the common unlawful design should be clearly proved, as a condition precedent to receiving evidence of such acts and declarations at all." 3 Ency. of Ev., 424; 1 Greenleaf Ev. (16 Ed.), 184a, 189; Owens v. State, 16 Lea, 1; Girdner v. Walker, 1 Heisk., 186.

"The acts and declarations of one conspirator are evidence against all, after the establishment of the conspiracy." 3 Ency. of Ev., 424; Owens v. State, 16 Lea, 1.

"Before the admission of the acts and the declarations of one as evidence against all, a prima facie case of conspiracy must be established." Owens v. State, supra.

The rule excluding the declarations of a former owner, when made subsequent to parting with his interest in the property, is subject to an exception in the case of conveyances shown to have been executed with the purpose of defrauding the vendor's creditors. Where such is shown to have been the purpose of the transfer, subsequent declarations are admissible equally with statements made before the conveyance. But as a condition to the admission of such declarations to defeat the purchaser's title or interest it must be shown, according to the better view, that he participated in or was connected with the fraud. The fraudulent common purpose must first be established outside of and independent of the declarations, before the latter are admissible as evidence; and the retention of possession has generally been regarded as sufficient to render admissible such subsequent declarations, unless the possession was consistent with the rights of the purchaser. See 1 R. C. L., 526-7, sec. 67; Shannon's New Code, 3143, note 95.

"It is error to admit as evidence the statements of co-conspirators made after the termination of the criminal enterprise." Sweat v. Rogers, 6 Heisk., 117.

Such statements, made after the transaction, were held inadmissible in Johnson v. Goldston, 52 S. W., 475.

If these statements are eliminated, there is no proof of conspiracy, and such declarations are not admissible until the conspiracy has been first established, hence this assignment must be overruled.

■ The fourth assignment, that the court erred in dismissing the bill against the defendant, the National Life & Accident Insurance Co., while set out in the assignments of error, was evidently abandoned, as no other reference to it was made in the argument. We are of the opinion that this assignment is not well made, for the reason that that company did not ask any affirmative relief. And by agreement it permitted Mrs. Higman to renew the mortgage after it had matured, with the agreement that the renewal of the mortgage would not prejudice the rights of any of the parties. Hence, the Chancellor did not err in dismissing the bill as against the Insurance Company.

All of the assignments of error having been overruled, the decree of the Chancellor dismissing the bills as to Mrs. Higman, must be affirmed. The costs of the cause, including the cost of appeal, are adjudged against the complainants and the sureties on their appeal bond, for which execution may issue.

Faw, P. J., and DeWitt, J., concur.